# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **2:23-mj-09398-ESW-1** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | August 22, 2023 |
| **Rafael Turner,** | ) | 3:57 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE**

### TRANSCRIPT OF PROCEEDINGS

### DETENTION HEARING AND STATUS HEARING RE IDENTITY

**APPEARANCES:**

For the Plaintiff:
    U.S. Attorney's Office
    By:  **Alanna R. Kennedy, Esq.**
    40 N. Central Avenue, Suite 1800
    Phoenix, AZ 85004

For the Defendant:
    Federal Public Defender's Office
    By:  **Jazmin J. Alagha, Esq.**
    850 W. Adams Street, Suite 201
    Phoenix, AZ 85007

Transcriptionist:
Jennifer A. Pancratz
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

<u>**P R O C E E D I N G S**</u>

1

2          (Proceedings commenced at 3:57 p.m.)

3          THE COURTROOM CLERK:  Case No. 23-9398-MJ, United

4    States of America versus Rafael Turner, before the Court for

5    detention hearing and a status hearing regarding identity.

6          MS. KENNEDY:  Good afternoon, Your Honor.  Alanna

7    Kennedy for the United States.

8          THE COURT:  Good afternoon.

9          MS. ALAGHA:  Good afternoon, Your Honor.  Jazmin

10   Alagha on behalf of Mr. Rafael Turner, who's present and ready

11   to proceed, Judge.

12         THE COURT:  Good afternoon.  Mr. Turner, good

13   afternoon.

14         THE DEFENDANT:  Good afternoon, Judge.

15         THE COURT:  We're here for a detention hearing and a

16   status hearing regarding identity.

17         Let's start with the detention hearing.  Is the

18   government seeking detention?

19         MS. KENNEDY:  We are, Your Honor.

20         THE COURT:  Okay.  Because the government has the

21   burden of establishing if someone is a flight risk or danger,

22   they begin.  I'll go back and forth with counsel.  Mr. Turner,

23   your attorney will get the last word.

24         Ms. Kennedy?

25         MS. KENNEDY:  Thank you, Your Honor.  The government

1    is going to proceed by proffer.

2         Obviously this is a presumption case given the charges

3    here, both the 924(c) and the drug trafficking charges.  I know

4    that the Court has a copy of the indictment.  Mr. Turner was

5    charged with 43 out of the 44 counts in that indictment, which

6    in addition to the drug trafficking and 924(c) charges also

7    include conspiracy to commit wire fraud, fraud in relation to

8    identity documents, maintaining a drug premises, and money

9    laundering.

10         This case arose out of the District of Kansas, and it

11   was a Title III wiretap investigation that went on for a

12   considerable period of time.  And in consultation with the U.S.

13   Attorney's Office in Kansas, they provided me a number of

14   documents that I turned over to Ms. Alagha.

15         And it's clear from those documents that the defendant

16   is the head of their conspiracy to distribute fentanyl

17   throughout Wichita, and as part of that, through the Inglewood

18   Family Gangster Bloods.

19         He is from Wichita but transplanted to Phoenix,

20   Arizona.  He and others acting on his behalf trafficked

21   significant quantities of fentanyl, both through USPS, carry-on

22   luggage, and road trips.

23         The Kansas investigation netted approximately 600,000

24   fentanyl pills, and that was just the fentanyl that they

25   recovered.

1          Thus far, there have been 11 other defendants arrested

2   in three cases that includes the indictment against Mr. Turner

3   in this case and two related indictments.  All of those are

4   unsealed.

5          THE COURT:  Is he in those -- he's not in those

6   indictments?

7          MS. KENNEDY:  He is not, Your Honor.  He is only named

8   in the one, but they are all three connected.

9          THE COURT:  Okay.

10          MS. KENNEDY:  And as part of the documents that I was

11   provided from the District of Kansas, it included several

12   incident reports or police reports from Wichita that involved

13   traffic -- a traffic stop and the execution of a search

14   warrant, both of which Mr. Turner was present for.

15          And in the search warrant, which was executed in

16   January of this year, thousands of fentanyl pills were found.

17   They were prepackaged and weighed over 6 kilograms.  There were

18   two guns in the home.

19          Mr. Turner was arrested and wouldn't readily admit

20   that the pills were his, but he didn't want his girlfriend,

21   whose house the search warrant was executed on, charged, so he

22   ultimately admitted that the pills were his.

23          THE COURT:  Was that his -- where he was residing?

24          MS. KENNEDY:  I don't know if it was a permanent

25   residence, but it was a residence that he frequented regularly.

1          THE COURT:  And that was in January?

2          MS. KENNEDY:  January 29th of 2023.

3          THE COURT:  And when was he released on that?

4          MS. KENNEDY:  I don't know, Your Honor.  I apologize.

5          THE COURT:  Okay.

6          MS. KENNEDY:  I don't know if -- he wasn't -- I don't

7    believe he was charged right after that.  Obviously he wasn't

8    arrested as part of this investigation until very recently, so

9    I don't know if there was additional detention that took place

10   after that --

11          THE COURT:  Okay.

12          MS. KENNEDY:  -- stop.

13          There was a second incident report that involved a

14   traffic stop where 4.2 kilograms of fentanyl pills were

15   recovered, and Mr. Turner's fingerprints were found on the

16   packaging in several locations.

17          He also has routinely used a false identity of Cory

18   Miller that he has regularly presented to law enforcement

19   officers.  He has obtained airline tickets using that identity.

20   He has used it to register cars.  He has presented it to police

21   officers on several occasions when he has been stopped.

22          THE COURT:  Let me stop you.

23          You're saying that he has a false identification for

24   which he was able to fly?

25          MS. KENNEDY:  That's correct, Your Honor.

1          THE COURT:  What was the name?

2          MS. KENNEDY:  Cory Miller.  And that is an actual

3     person.

4          THE COURT:  Was it an actual identification, or was he

5     just using someone else's?

6          MS. KENNEDY:  He was using someone else's

7     identification.  That -- there's -- one of the other three

8     indictments in the case charges a co-conspirator of

9     Mr. Turner's, who is the one that obtained that ID.  I don't

10    know the -- the specifics of that, but this co-conspirator

11    obtained the Cory Miller identification and provided it to

12    Mr. Turner.

13         THE COURT:  Is the Cory Miller identification

14    legitimate?  For example --

15         MS. KENNEDY:  Yes.

16         THE COURT:  -- is there a real Cory Miller who might

17    have allowed Mr. Turner to use the identification, or was the

18    Cory Miller a victim who is just a random person whose identity

19    was stolen?

20         MS. KENNEDY:  My -- based on my conversations with the

21    Kansas AUSAs, the Cory Miller is a real person who is a victim

22    and did not willingly participate in any of this activity.

23         THE COURT:  Okay.  Go ahead.

24         MS. KENNEDY:  Mr. Turner had access to -- still has

25    access to this false identification because when he was pulled

1    over in Phoenix, he didn't have a physical copy of it.  He

2    showed them the identification on his phone.  So law

3    enforcement has not yet located the actual identification

4    document that he used.

5         And Ms. Dean, the co-conspirator who provided

6    Mr. Turner with the false identification or the identification

7    of the real Cory Miller, is out on release, so theoretically

8    Mr. Turner would still have access to her.

9         And, I mean, obviously the Court read through the

10   indictment.  There is the 924(c) counts.  There were two

11   handguns found in the execution of the search warrant on his

12   girlfriend in Kansas's house where the fentanyl was found.

13        Mr. Turner does not have any legitimate employment.

14   There was some IRS information that indicated he worked for

15   DoorDash for roughly six months in 2021, but otherwise, he has

16   had no wages in Kansas since 2013 and no wages in any other

17   state for the past 18 months.

18        So based on that, Your Honor, I don't believe that

19   there's any conditions whatsoever that can overcome the

20   presumption in this case, given the nature of the charges, the

21   potential penalty, Mr. Turner's access to a false

22   identification, and the sheer volume and prevalence of the

23   fentanyl distribution in this case.

24        And also, he was cautioned by law enforcement at least

25   as of January 2023, where he admitted involvement in this, and

```
 1    was not remotely deterred and continued to engage in drug

 2    trafficking activity.

 3              THE COURT:  In the indictment, where does it list

 4    events after January 29th of 2023?

 5              MS. KENNEDY:  I'm sorry, Your Honor, what was that

 6    question?

 7              THE COURT:  It says continuing through March of -- 18,

 8    2023, for Count 21.  I'm just trying to get a sense of how

 9    many -- where in the indictment does it list conduct after his

10    arrest?

11              MS. KENNEDY:  I'm sorry, Your Honor, his arrest in

12    January of 2023 when he was interviewed during the execution of

13    the search warrant, so there was at least some continuing

14    activity through March of 2023.

15              THE COURT:  Where is that in here?  I see the date

16    that that's listed, but the overt acts that are listed, for

17    example, on page 10 state January 28th of 2023.

18              I'm not saying you're wrong.  I'm just asking you to

19    help me -- or establish for me what he did after January 29th,

20    because there are a couple things I'll have to consider.  One

21    is he was released and didn't flee.  You were able to find him

22    again.  He could have been charged, but he didn't.  He's

23    still -- I assume readily found.

24              On the other hand, if he is allegedly committing

25    offenses after that arrest, you're correct, that's a red flag.
```

1   So what can you tell me that the indictment shows that he did

2   after January 29, 2023?

3           MS. KENNEDY:  The AUSAs in Kansas told me that he

4   traveled to Arizona from Kansas using the Cory Miller

5   identification, so at least at some point after his arrest on

6   January 29th, 2023, during the execution of that search

7   warrant, at some point after that, he traveled to Arizona using

8   that false identification on an airline.

9           THE COURT:  Do you know of any other conduct he

10  engaged in that may have been illegal after January 29th?

11          MS. KENNEDY:  No, Your Honor.

12          THE COURT:  Okay.  I have a few more questions,

13  though.

14          You mentioned the Gangster Bloods.  Is that referenced

15  in the indictment anywhere?

16          MS. KENNEDY:  It is not, Your Honor.

17          THE COURT:  Okay.  But you're telling me there's

18  information that this conduct was conducted in furtherance of

19  that gang?

20          MS. KENNEDY:  Only that -- the only information I was

21  provided was that Mr. Turner, as the leader in this fentanyl

22  trafficking case, that he was -- that the trafficking was done

23  by the Inglewood Family Gangster Bloods.  But I don't have any

24  additional information other than that.

25          THE COURT:  Is he a -- I don't know what they would

1    call it in that location, but would he be in a database that

2    references being him -- him being affiliated with that gang?

3            MS. KENNEDY:  Possibly, Your Honor, but I don't have

4    that information.

5            THE COURT:  So for our purposes, the answer is you

6    don't know.

7            MS. KENNEDY:  Not apart from what the AUSAs in Kansas

8    communicated to me, no.

9            THE COURT:  Well, that would be allowed, if they told

10   you that he was affiliated with the gang or a registered

11   member.  Do you know?

12           MS. KENNEDY:  I don't know, Your Honor.

13           THE COURT:  Okay.  I don't want to guess.  You could

14   say "possibly," but for here, I -- I can accept assertions

15   that, yes, that's true; but if we don't know, then I won't

16   consider it.

17           The two firearms, they're listed in the -- they're not

18   listed in Count 35, but they are in the forfeiture, the Glock

19   and the Kimber 9-millimeters.  You mentioned -- I assume those

20   are the same two guns.  Do you know where they were found in

21   the apartment?

22           MS. KENNEDY:  I believe they were found -- may I have

23   one moment, Your Honor, to look at the police report?

24           THE COURT:  Yes.

25           MS. KENNEDY:  I don't know off the top of my head.

1          THE COURT:  How about this:  You can look those things

2     up, and I'll come back to you.

3          MS. KENNEDY:  Thank you, Your Honor.

4          THE COURT:  I'm sure Ms. Alagha will have quite a bit

5     to address.

6          Ms. Alagha?

7          MS. ALAGHA:  Thank you, Your Honor.

8          I believe, from my recollection of the incident

9     report, they were found inside of a drawer, Judge.

10          THE COURT:  Okay.

11          MS. ALAGHA:  In the apartment of Andrea Bohanon.

12          THE COURT:  Okay.  Well, I don't know if they were

13     next to a pile of fentanyl pills or if they were, you know, in

14     a back bedroom in a box, you know, unloaded, so we'll see.

15          Go ahead.

16          MS. ALAGHA:  Your Honor, my understanding as far as

17     that goes is the fentanyls were found packaged underneath the

18     bedroom mattress, and the guns were in a drawer in that same

19     bedroom.  That's my understanding, Judge.

20          THE COURT:  All right.  Well, the grand jury did

21     indict on the count, so we know at least there was probable

22     cause finding by them that there was possession of firearms in

23     furtherance.  If either party has additional facts, I'll

24     consider them, either mitigating or otherwise.

25          Do you have any other information?

1          MS. ALAGHA:  I don't have any other information as far

2     as the weapons, Your Honor, Judge.

3          THE COURT:  Okay.  Go ahead.

4          MS. ALAGHA:  So, Your Honor, I want to focus on the

5     ties to the community, and I will also address the Cory Miller

6     information.

7          Well, let me start with that, Judge.  I received a

8     couple of citations out of Kansas with the name of Cory Miller.

9     I received a document labeled identity theft of Cory Miller,

10    but I received no information, no police reports, no

11    documentation connecting my client with the use of Cory Miller.

12         Certainly the government is free to proffer

13    information that she received from the AUSA, who had additional

14    information than I did.  So I cannot address in depth the Cory

15    Miller allegations.

16         I do understand that my client has strong ties to

17    Kansas and strong ties to Phoenix.  He's been living in

18    Phoenix, Arizona, for the last six years.  He's been -- had a

19    stable home and a stable residence.  He has a 6-year-old son

20    here who goes to school at Cesar Elementary.  He has his

21    girlfriend, Teneisha Bascombe, who's present here and is a

22    strong family support for him.  She has no criminal history.

23    She works with DES, and she is a positive influence.

24         It is true that they've had their ups and downs in

25    this relationship, but what is clear is that he does have a

1    source of positive, strong family support here in Arizona.

2    She's been here ten years.  She lives here with her mother and

3    father, who have a strong, stable jobs, one with Humana and the

4    other one with Allied.  They have no criminal history.

5              So he has that source of support here, Judge.  And so

6    I want to focus on his ties to that community.

7              She is willing to act as a third-party custodian and

8    willing to be screened as a third-party custodian.  I

9    understand she recently moved to 130 North 56th Street in Mesa,

10   Arizona, Apartment 206.  She's been living there three weeks.

11             The couple has been working on their relationship.

12   She sees changes in him and believes that he is a good father.

13   He's involved in his son's sports, taking him to soccer and

14   karate.  They're focusing on family life.

15             And when I spoke to her before the hearing, Judge, she

16   indicated that they were looking at starting to -- enrolling in

17   a church but had not gotten to that point because ultimately he

18   was arrested.

19             She indicates he's never been violent before.  He's

20   never been violent around her.  He's never -- she's never seen

21   him be violent towards anybody else, so there's no danger to

22   the community there.

23             I asked her about weapons.  She has not seen him with

24   any weapons.  She doesn't allow weapons in her home, and

25   certainly he's never brought weapons around her family.

He has extended family here in Arizona, including an aunt and an uncle and cousins, so he has that strong source of family support in Arizona.

He also does have strong ties to Kansas, so he would -- if the Court wanted to release him, he has the ability and resources to go and travel to Kansas, stay with his mother, who has been living there.  He was born and raised in Kansas. He would have a place to stay if he needed to travel.

I spoke to Ms. Bascombe, and she indicated they would have the funds to travel to any court proceedings as needed, and certainly he does not oppose any of the conditions that are listed in the pretrial services report and any additional conditions that the Court may have.

He does not have any -- a U.S. passport.  He does not have ties outside of the United States.  He has no motive to flee.  He's ready and willing to defend against the charges.  I also did not receive any documentation or information as far as connections to any gang activity.

But what I do know is that if he wanted to flee, Judge, he could have and he would have, and he did not.  So despite prior connections, he -- which he's defending -- and I understand the government's points that he admitted to being in possession of that fentanyl, but as pointed out, the fentanyl in the home, he did so only after trying to protect Andrea Bohanon, who was accused of the fentanyl pills.

1           So, Judge, I do believe that there are arguments here

2    that he has a defensible case, from my limited understanding.

3    Certainly, the Court is aware that the weight of the evidence

4    is the least important factor, and whether he will appear is

5    the most important factor.

6           I know that his criminal history is somewhat limited

7    to misdemeanors, so he has no felony priors, nothing that would

8    impede his ability to own or possess a weapon.  He doesn't

9    have -- he's not a felon that would prevent that.

10           He has the two most recent arrests, which was in

11    January and March of 2023.  Those are in connection with this

12    case, based on my review of the documents that the government

13    has provided.

14           So in light of the circumstances, Judge, I do believe

15    and agree with pretrial services that those conditions would

16    assure his appearance.  We have the additional possibility of

17    having Ms. Bascombe as his third-party custodian and any other

18    additional conditions that the Court would want to impose.

19           THE COURT:  All right.  Do you have any information

20    why he was -- you're suggesting he was rearrested in this

21    investigation on March 18th.  Is that correct?

22           MS. ALAGHA:  Yes, Your Honor.

23           THE COURT:  Do you know anything about that from the

24    discovery?

25           MS. ALAGHA:  From the information that I received, it

1    was a traffic stop relating to a Jeep.  Andrea was the driver

2    and he was a passenger, and fentanyl pills were found in the

3    vehicle.

4            THE COURT:  Okay.  Thank you.

5            All right.  Like I said, I'll give you the last word.

6            Ms. Kennedy?

7            MS. KENNEDY:  Your Honor, Ms. Alagha is correct that

8    March 20, 2023, was in reference to the traffic stop where the

9    fentanyl pills were recovered, and they were recovered in a

10   suitcase filled with men's clothing.  His then-girlfriend was

11   the driver.  There was a child in the backseat who was a

12   female.  So it was a suitcase full of men's clothing, and the

13   fentanyl pills were sewn into the lining of that suitcase.

14           THE COURT:  How much?

15           MS. KENNEDY:  How much?  That was I believe

16   4.2 kilograms of fentanyl, Your Honor.

17           THE COURT:  Okay.

18           MS. KENNEDY:  Yes.

19           And in addition to that, the firearms, Ms. Alagha's

20   also correct that those were located in a drawer in the

21   residence, in a different place that the fentanyl pills were

22   located.  But one of the things that the wiretap revealed was

23   that Mr. Turner admitted on the wiretap to keeping a firearm in

24   his bedside table.  I don't have any additional information on

25   that other than that was communicated to me by the AUSAs there.

1          So I think taking -- looking at all of the detention

2     factors in 3142(g) and given the serious nature of these

3     charges, the fact that March 20, 2023, was not that long ago,

4     and Mr. Turner has the means and ability and motive to travel

5     out of Arizona, out of Kansas, and given that he's still in

6     possession of this Cory Miller identification, there's really

7     no way that we can -- we can track -- track that.  I mean, he

8     could use that to go anywhere.

9          So for those reasons, Your Honor, we would ask that he

10    remain detained as a flight risk and a danger.

11         THE COURT:  Thank you.

12         Ms. Alagha?

13         MS. ALAGHA:  Nothing further, Your Honor.

14         THE COURT:  Okay.  First, good afternoon to the two of

15    you who are here as well, I assume for Mr. Turner, in support

16    of his release.

17         There are two questions, Mr. Turner:  flight risk and

18    danger.  Before I discuss those, there are four questions every

19    judge answers regarding those.

20         One is the nature and circumstances of the offense.

21    These are cases we see routinely.  Yesterday I had defendants,

22    two of them, one I released, one I detained.  They were

23    involving fentanyl.  They were charged with substantial

24    quantities like this, less fentanyl than is alleged here.

25         But I'll tell you what I'll tell them, that these

1    types of charges, if they're charged as the most serious, can

2    be a mandatory minimum of ten years up to lifetime

3    imprisonment.

4        So you've -- you're now involved in the most serious

5    drug trafficking offense that can be charged.  Like you, those

6    two individuals had a 924(c)-related case, which that carries

7    with it a mandatory minimum of five years up to life, mandatory

8    consecutive.

9        Like I said, I released one and detained the other, so

10   I'm just giving you an example of what I told them.  You've,

11   again, come across one of the most serious charges you can have

12   in a drug-related case.  So the nature and circumstances of the

13   offense are certainly serious.

14       In addition to you, in your case, there are some

15   aggravating factors.  And there's some mitigating factors as

16   well.  I'll get to that.

17       The weight of the evidence here, there's a wiretap.

18   They have seizures.  They have drugs in the car.  They have

19   statements, your statements to law enforcement.  I'm not your

20   trial judge.  You're not going to see people in Arizona again,

21   likely, but that is the least important factor.  You're

22   presumed innocent, but the government has a compelling case.

23       The third factor -- actually, I'll go to the fourth

24   factor -- is the nature of the danger to the community.  I'll

25   say to you what I said to them.  I was recently at a seminar

1    where they said for these pills that are made and they're

2    not -- you know, they're fraudulent M-30 pills, one out of

3    eight of them can contain a lethal dose.  At these quantities,

4    600,000 fentanyl pills, you're talking about potentially

5    hundreds of people who could overdose from these pills.

6         And everyone knows how dangerous fentanyl is.  So

7    those three factors for both those individuals and for you,

8    they would all favor detention.

9         History and characteristics, that's the final factor,

10   and now I'll start talking about your case.  You have mostly

11   driving-related convictions.  You don't have a prior felony

12   conviction.

13        What assault-related or battery-related case you have,

14   there was a conviction, but it's more than ten years old.  It's

15   not really relevant to what was happening here.  There's no

16   allegations of that.

17        So your criminal history doesn't favor detention, I

18   don't think.  It's just too old and too small to matter.

19        You have strong family support.  You've lived here and

20   in Kansas for a long time.  You have some employment.  So those

21   are all factors that are to your credit.

22        You tested positive for marijuana.  You don't have a

23   drug problem.

24        And there is another factor here regarding flight

25   risk, which is that you were arrested in January but released.

1    I'll just tell you, from experience, that usually in these

2    wiretap cases, they're not ready to bring the case altogether.

3    They could have.  They didn't.  You were released.  They found

4    you.  I haven't heard any information about any problems

5    arresting you.

6            You've lived in the United States your whole life.  I

7    don't think you're going to pick up and go somewhere else, so

8    just tell you, as far as flight risk goes, it's a close call

9    but that factor would not favor detention.

10           But the real question for you is danger.  It's a

11   higher standard of clear and convincing evidence.  This may

12   surprise you.  Aside from the serious nature of all these

13   charges, to me, one of the most aggravating factors is you

14   were -- even though you were in the house found with all the

15   drugs, the weapon, your statements, you're involved in an

16   arrest a little more than a month later in March, and they

17   found 4.2 kilograms of fentanyl.

18           Somehow, if for no other reason than not being

19   completely terrified about what happened in January -- you're

20   presumed innocent, but I have to consider these factors.

21           There's a suitcase in your vehicle, and it's the exact

22   same type of drug that was found in the house.  It's

23   substantial quantities of fentanyl.  Looks like you have

24   allegedly picked up where you might have left off in January.

25           That, to me, reflects a very real danger to the

1  community.  That is -- tips the scales as far as clear and

2  convincing evidence.

3          And I do find that when you consider the type of drug,

4  the weapons, the fact that you were -- all that had been seized

5  and then you continued in the exact same alleged conduct and

6  were found with a substantial quantity of fentanyl a little

7  more than a month later is a very real concern for the

8  community.

9          So I'm ordering detention on that ground, the higher,

10 the more difficult burden of establishing danger, and it's for

11 all of those reasons.

12         Like I said, I don't think you're a flight risk.  All

13 your ties are here, but I find that conduct very concerning.

14 And it's alleged conduct.  So I know you wanted to be released.

15 Under that ground, I'm ordering your detention.

16         Let me tell you a few things.  First, most of the

17 information in your case is out of another state.  You have a

18 right to appeal in that state.  You can talk with your counsel

19 who will be appointed.

20         You've heard everything that I know about the case

21 here.  Other than the indictment, you've heard everything I've

22 relied on, and I'll issue my order promptly.

23         The second thing I'll tell you is, people ask how long

24 it takes you to get there, and it can take anywhere from

25 several days to a week or two.  The marshals arrange that

1    transport.  The court has nothing to do with it.  Really, it's

2    when they have a flight and they're able to move sufficient

3    numbers of people.  They coordinate all that.

4        But they'll transport you, and then you'll begin your

5    case there.  And, like I said, you'll have counsel.  And

6    there's a lot in your case.

7        I'll just mention that one of the most significant

8    facts for me regarding flight risk was that you didn't flee,

9    and you were here.  But regarding danger, the fact that you

10   allegedly were still involved in this in substantial quantities

11   after what had happened in January demonstrates, along with the

12   other factors, why the Court's elevated the standard of clear

13   and convincing evidence regarding danger.

14       I know that's not the answer you wanted to hear.  I

15   prefer just to tell you, so you understand it, rather than go

16   back and take it under advisement and write a few sentences and

17   you don't understand.  At least I've tried to explain it so you

18   and your family could, even if you don't agree, understand the

19   ruling.

20       We have the issue of the identity hearing, since

21   you're remaining in custody.  It's here for a status hearing.

22   Do you know how he wishes to proceed?

23       MS. ALAGHA:  Your Honor, we're waiving the identity

24   hearing.

25       THE COURT:  Okay.  Mr. Turner, you have a right to a

1    hearing to establish that you're the person who's listed.  You

2    can waive that.  It will just establish you're the Rafael

3    Turner who's listed in the indictment, nothing else.  You're

4    not admitting anything.  But we need to establish your identify

5    before you're transported.

6            So your attorney says you're waiving that hearing.  Is

7    that correct?

8            THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

9            THE COURT:  Okay.  We'll let -- note that waiver and

10   establish you're the person listed.

11           Ms. Alagha, is there anything else we can address for

12   today?

13           MS. ALAGHA:  No, Your Honor.  Thank you.

14           THE COURT:  Okay.  Ms. Kennedy, anything else?

15           MS. KENNEDY:  No, Your Honor.  Thank you.

16           THE COURT:  All right.  I thank you all.

17           To the two of you, I know that you were here

18   listening.  I appreciate your being involved in the process,

19   and I did consider it.

20           With that, we're adjourned.  Thank you all.

21           (Proceedings concluded at 4:26 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3         I, JENNIFER A. PANCRATZ, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8         DATED at Phoenix, Arizona, this 8th day of December,

9    2023.

10

11

12

13                            s/Jennifer A. Pancratz

14                            Jennifer A. Pancratz

15

16

17

18

19

20

21

22

23

24

25